## Joseph Denunzio Fruit Co. v. Louisville & N. R. Co.

Nov. 29, 1938.

THOMAS C. MAPOTHER for appellant.

WOODWARD, DAWSON & HOBSON, H. T. LIVELY and WILBUR O. FIELDS for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Appellant, Joseph Denunzio Fruit Company, shipped three carloads of peaches from Henderson, Kentucky, to New York City in August, 1935, over the line of appellee, Louisville & Nashville Railroad Company, as initial carrier. The Fruit Company originally sought to recover $2,326.50 from appellee, claiming market loss and physical loss and damage caused by delay in shipment and the manner in which the shipments were handled. After depositions were taken in New York appellant amended its petition, abandoning the claim of market loss, thereby lowering its claim to $1,684. Appellee's answer admitted liability in the sum of $10.43, because of damage to a few of the baskets of peaches in handling. During the trial appellee offered to confess judgment for $20 but the offer was rejected by the appellant. Eleven jurors signed a verdict for defendant. The judgment on the verdict directed that appellee recover costs from appellant to be offset by the judgment for $10.43 in favor of appellant. The Denunzio Fruit Company appeals.

Appellant urges reversal because (1) there were errors in the instructions given by the court, and the court erred in refusing the instructions offered by appellant; (2) the court erred in permitting certain evidence to be admitted; and (3) the verdict and judgment are flagrantly against the evidence.

One of the carloads of peaches was released to the carrier at Henderson at 7:30 p. m. August 16th, and the other two were released at 6:40 and 9:25 p. m. August 19th. The first car moved out of Henderson on the first train available between 2 and 3 a. m. on August 17th. The other two cars were picked up by the first train available at about the same hour on August 20th. The first car was consigned to Cincinnati, but before reaching its destination was duly consigned to New York. This car was taken from Cincinnati to New York by the Pennsylvania Railroad Company. The other two cars were taken by the same railroad from Louisville via Indianapolis to New York. The first car reached Harsimus Cove (Jersey City, New Jersey) at 9:55 a. m August 20th. The other two cars reached the same

point at 1:25 a. m. August 23d. The final destination of the cars was the Pennsylvania Railway market pier, New York. To reach this point it is necessary to place cars on a ferry at Harsimus Cove and take them across North River to the pier. In both cases the cars of peaches remained at Harsimus Cove until shortly before midnight of the day they reached that point. It was shown that a car must reach the pier by 2 a. m. to permit its being unloaded and inspected for that day's market. Witnesses testified that the peach market at the pier opens between 3 and 4 a. m.

Appellant insists that the cars were a day late in being delivered at the pier, because they should have arrived in New York on the third night out for a fourth morning market. Appellee insists that the cars did arrive in New York on the third night out for fourth morning delivery. Appellant counts time from the time the cars were released to the carrier at Henderson, while appellee makes the count from the time the cars were picked up at Henderson on the first available train. There is no indication that appellee gave any assurance to appellant that the cars would reach New York for any particular day's market. Appellant had a right to expect, however, that the cars would move on regular schedule time for perishable freight. While appellant attempts to show that the last two cars could have been delivered at Indianapolis in time to reach a fast moving freight train between St. Louis and New York, it appears that the three carloads of peaches were handled by the Louisville & Nashville Railroad and the Pennsylvania Railroad Company on the same schedule that other perishable freight was handled between the points in question. Appellant objected to the testimony of appellee's witnesses showing the movement of the cars between various terminal and division points. The evidence was based upon the reports of train conductors showing the movement of trains and cars in question and made in the regular course of their duties. The evidence was given by employees of the railway companies charged with the keeping of such records. Under the circumstances, it is our conclusion that the evidence was competent. See Dattilo Fruit Company v. Louisville & Nashville Railroad Company, 238 Ky. 322, 37 S. W. (2d) 856, and cases cited therein.

Reports made by an employee of the consignee on

the condition of the peaches in the first car when unloaded showed, "Pack......tight to fairly tight, Color ......Pale, many greenish tinge to green, Defects..... 355 bushel basket Elbertas 10 to 16%, Decay......5 to 25% consisting mostly of black rot."

The inspection reports on the contents of the other two cars were approximately the same. The "black rot" referred to in the inspection reports appears to have been what is commonly known as "brown rot" in peaches. Ben Niles, one of the leading fruit growers in Kentucky, testified that brown rot is a fungus disease which may be present in a peach orchard. He stated that moisture and heat are necessary for brown rot development, and that it is particularly a menace at the harvesting period. He stated also that he dusted his orchards four times in five days during the 1935 picking season to control the disease.

There were few, if any other, Kentucky peaches sold on the New York market at the time these three carloads of peaches were sold there. Samuel W. Russell, connected with the United States Department of Agriculture, and a market reporter on fresh fruits and vegetables in New York, testified that on August 24th his record showed the following prices on Kentucky Elberta peaches: "Fair to poor quality and condition. 2½ inch minimum 93c to $1.30. Two inch minimum 68c to 93c. One and three-quarter 65c." The quotation on Hales was "Fair to poor quality and condition, bushels 2¼ inch minimum, $1.18." Appellant introduced a publication entitled "The Producer's Price-Current," in order to show the market price of peaches in New York on the days these peaches were sold, in his effort to establish the market price of peaches as a basis for his claim of damages because of the reduced price received for the three carloads of peaches. It is clear that some of the peaches were defective when they were unloaded, and that they did not bring prices comparable to the best grades of peaches.

In this connection, there was evidence to the effect that the last two carloads of peaches shipped from Henderson were among the last of the crop in that section. Frank Parrish, an employee of appellant, testified that they started shipping peaches out of Henderson around August 11, 1935, and finished up about the 19th or 20th of the month. Furthermore, the jury had before it the

testimony of Ben Niles relative to the prevalence of brown rot in peach orchards, especially at the picking season. No witness testified that he personally inspected all of the peaches that were packed and shipped in the three cars. Parrish stated that he was in the orchards and around the packing sheds and was present part of the time when the cars were being loaded and that, in his opinion, the peaches loaded in these cars were sound. There is no testimony, however, that all peach growers took the same precautions as Ben Niles in attempting to check brown rot. It is our conclusion, therefore, that there was ample evidence to warrant the reference to damage from ''inherent nature'' and ''defects'' in the peaches in the instructions given by the court, and that they were not substantially prejudicial to appellant.

Appellant sought to show that the cars were loaded under the supervision of an agent of appellee. Be this as it may, there is no showing that the cars were improperly loaded. An inspector for the Railroad Perishable Agency, who inspected the shipments at the pier in New York for breakage and physical damages in handling, stated that the amount of recoopering necessary for the baskets in these three cars was about average or less.

There is conflicting evidence as to whether protest as to the condition of the peaches, when received, was lodged with the carriers' agents before the shipments were accepted by the consignee. Inspection reports of the consignee's agents indicate such protest, but appellee's witnesses stated that protests were not made in accordance with the custom at the pier for making such protests and that no inspection by an independent inspection agency was requested. It was pointed out also that the inspection services of the U. S. Department of Agriculture were available upon request, but not required, in such cases. Aside from this, we have seen that the peaches were accepted and sold by the consignee on the days they were unloaded at the pier, and that some of them were defective and appear to have sold for prices ranging accordingly. There was sufficient evidence also to have warranted the jury in concluding that some of the peaches were of an inferior grade, as pointed out above.

There remains the question as to the testimony relative to the manner in which the refrigerator cars

carrying the peaches were iced. The ice bunkers of the cars were filled at Henderson, according to witnesses on both sides. The type of refrigeration called for included a certain percentage of salt, the salt being used to lower the temperature in the cars. The Louisville & Nashville Railway agent at Henderson testified that many of the cars of peaches shipped from that point in 1935 were refrigerated without the use of salt. Appellant objects strenuously to the testimony of certain employees of the Fruit Growers Express Company. This Company iced the cars after they left Henderson. The testimony objected to was given from icing and inspection records by the employee of the company who had them in his charge, but who did not actually do the icing and inspecting. The reports were made by employees of the Fruit Growers Express Company in the regular course of their duties, and represented a complete history of the refrigeration of the cars in question up until they were unloaded at the pier. These reports showed that standard refrigeration was maintained in these three cars up until they reached the pier. It is our conclusion that this evidence was competent under the rule discussed in the Dattilo Fruit Company Case, supra.

Therefore, for the reasons set out herein, we are constrained to hold that the judgment of the trial court should be, and it is, affirmed.